UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CLEARSHARK, LLC.,

    Plaintiff,

VERSUS

J2R SOLUTIONS LLC,
CHRISTOPHER GALEONE, AND
JONATHAN SPIGLER

    Defendants.

CASE NO. 8:22-cv-01816-MSS-MRM

## MEMORANDUM IN SUPPORT OF TIME-SENSITIVE MOTION FOR TEMPORARY RESTRAINING ORDER AND TO HEARING ON REQUEST FOR PRELIMINARY INJUNCTION

Plaintiff ClearShark, LLC. ("ClearShark") respectfully files this memorandum in support of its *Motion for Temporary Restraining Order and to Set Preliminary Injunction Hearing* against its two former employees, Defendants Christopher "Roman" Galeone and Jonathan Spigler, and their new company, Defendant J2R Solutions LLC (collectively, "Defendants").

### PRELIMINARY STATEMENT

ClearShark seeks a temporary restraining order and preliminary injunction due to its discovery that Galeone and Spigler—former trusted employees—established a competing entity in Florida months before abruptly resigning and then, the day before resigning, downloaded a trove of trade secrets that, when viewed as a composite, comprise ClearShark's confidential playbook for obtaining and

1

retaining business. This new competitive entity —J2R Solutions LLC ("J2R") — now has ClearShark's highly valuable trade secrets and, *at a minimum*, is positioned to use them to unfairly compete. Based on the computing activity of Galeone and Spigler, as well as their refusal to return and remediate the misappropriated information, J2R, Galeone, and Spigler are likely taking advantage of their unfair position by also actively *using* these stolen trade secrets. ClearShark thus faces irreparable harm from Defendants' continued possession and/or use of these trade secrets, and the Court must enter a temporary restraining order to preserve the *status quo* by restraining Defendants from disclosing, using, accessing, and retaining the misappropriated information and ensuring — through a thorough forensic examination — that such information is located and remediated from their computing devices, networks, accounts, and platforms.

## VERIFIED FACTS[1]

### ClearShark's Business and Its Trade Secrets

ClearShark provides cutting-edge solutions in data storage, networking, virtualization, and cybersecurity to public- and private-sector clients in the United States. ClearShark's contracts with its customers can run into the millions of dollars

---

[1] The following facts are set forth and verified under oath in ClearShark's *Verified Complaint* (R. Doc. 1). For ease of reference, ClearShark also sets them forth here, and is prepared to present witnesses to testify as to the allegations in the *Verified Complaint* upon the Court's setting of this matter for a preliminary injunction hearing.

and span multiple years. Securing one contract positions ClearShark to have the ability to win repeat business on that same project or other future projects with the customer. Cultivating customer relationships is essential to ClearShark's business.

To develop and maintain customer and supplier relationships, ClearShark invests significant time, money, and energy into researching customer and supplier needs, developing marketing strategies, creating financial forecasts and business forecasts, and developing its pricing structures. These efforts, which are dependent on the accumulation, application, and secrecy of ClearShark's confidential business information, are crucial to ClearShark's success in the competitive market. For this reason, ClearShark's confidential information, identifying customers and suppliers, and customer pricing information has substantial value to ClearShark.

ClearShark's competitive position largely rests on protecting its confidential business information in this highly competitive field, and ClearShark takes reasonable measures to keep its information out of its competitors' hands. The composite of this information, moreover, is not generally known outside of ClearShark, and ClearShark only entrusts this information with employees who need to know the information to perform their jobs.

To protect its information, ClearShark requires its employees to sign and agree to employment policies and procedures designed to protect the confidentiality of its information. ClearShark, for instance, requires employees to sign and

acknowledge receipt and compliance with its employee handbook, which makes clear that the "protection of confidential business information is vital to the interests and success of ClearShark"; that "confidential information should not be communicated or disclosed, purposefully or inadvertently, without proper authorization from Senior Management or a board member"; that "[a]ll confidential information remains the exclusive property of ClearShark"; and that employees, before leaving their employment with ClearShark, must "return all confidential and sensitive information directly to a member of the senior management or a board member." Further, the handbook makes clear that "ClearShark has expended a great deal of time, money and effort to develop and maintain its proprietary and confidential business information"; that employees "occupy a position of trust and confidence and will have access to proprietary and confidential business information"; that employees "will use such information solely for ClearShark's benefit, and will not disclose any protected information to any third party without ClearShark's prior express written authorization"; that "all documents, files, electronic records or data, or records or materials of any sort pertaining to ClearShark's business, whether prepare by [the employee] or otherwise coming into [the employee's] possession or control, are the sole and exclusive property of ClearShark"; and that, following termination, employees "will have no right to keep

or use such documents, information or artifacts and will immediately return them to ClearShark."[2]

J2R knows that ClearShark takes these measures to safeguard its confidential business information, as J2R's three member-managers (Galeone, Spigler, and Penoyar) agreed to be bound by these obligations. In fact, in early 2022, each signed a compensation plan that incorporated these policies. The plan documents specifically state that the "plan augments and incorporates the definitions, policies, and guidelines specified in the ClearShark Employee Handbook."[3] ClearShark further protects its confidential information on password-protected servers and cloud-based platforms that can only be accessed by select employees who have a valid reason to review or use the information. ClearShark also trains its employees, including all new hires, with access to confidential company documents that the documents are confidential and valuable to ClearShark and should not be disclosed to anyone outside of ClearShark.

ClearShark's confidential business information, such as customer and contact lists, customer-specific financial information, pipeline and forecasting information, supplier information and agreements, and proposals and draft proposals to customers

---

[2] *See* **Exhibit 1**, Excerpts from ClearShark Employee Handbook relating to confidentiality obligations. (R. Doc. 1-1)

[3] *See* **Exhibits 2 and 3**, Redacted Compensation Plans. (R. Doc. 1-2 and R. Doc. 1-3, respectively)

for certain work on which ClearShark is bidding, is valuable because it is kept secret. In the hands of a competitor like J2R, the information can be used to target specific projects and review, compare, and undercut ClearShark's pricing on competitive bids, substantially harming ClearShark's business prospects.

### Galeone and Spigler as Admininstrators of ClearShark's Capsule Platform

One such protected platform that ClearShark uses to maintain highly confidential information about, for instance, sales opportunities, customer and partner contacts, and pricing and bid information is Capsule, which is a cloud-based, customer relationship management platform ("Capsule CRM platform") for managing relationships and interactions with customers and potential customers.

Galeone and Spigler were the administrators of ClearShark's Capsule CRM platform and ensured that it contained accurate information relating to customer and partner contacts, sales opportunities, and project information (including bids and pricing). Further, Galeone and Spigler ensured that ClearShark's Capsule CRM platform was interacting with the ClearShark email accounts of the ClearShark employees who had access to ClearShark's Capsule CRM platform and was pulling in and correlating emails from those accounts.  In essence, ClearShark's Capsule CRM platform contained an up-to-date playbook of ClearShark's confidential business strategies and intellectual property and allowed ClearShark employees who

had access to the platform to nimbly adjust business development and project management strategies.

ClearShark's Capsule CRM platform, moreover, was password-protected and not open to the public or even to all employees of ClearShark. Verified credentials are required in order to gain access to the platform at https://clearshark.capsulecrm.com/login:



If a competitor were provided access to the contents of the ClearShark CRM platform, it would have a playbook of how compete unfairly with ClearShark, without investing the time and resources needed to compile this confidential information.

### *J2R Tries to Replicate ClearShark but Does So Unlawfully*

J2R was not a direct competitor of ClearShark (and did not exist) until it was established on March 18, 2022, by Galeone, Spigler, and Penoyar while they were still employed by ClearShark. These three were long-time employees of ClearShark. Galeone was a Solutions Architect for nine years at the time J2R was established; Spigler was a Systems Engineer who had been with ClearShark for seven years; and Penoyar was an Account Manager for seven years.

Their plan was to essentially replicate ClearShark through J2R. Because they kept secret their intentions and plans to launch a competitive business, ClearShark continued to employ them and allow them access to the company's confidential business information, including allowing them to continue to act as the administrators of ClearShark's Capsule CRM platform. Indeed, even a quick comparison of ClearShark's website and J2R's website that recently went live shows that J2R is advertising itself as having working relationships with the same partners that ClearShark has worked so diligently to establish and maintain over the years:



Partners | ClearShark                    Partners (j2rsolutions.io)

ClearShark is unaware of when Galeone, Spigler, and Penoyar intended to disclose their efforts to ultimately resign to focus exclusively on launching J2R, but their plans were accelerated on July 5, 2022. On that morning, ClearShark held a call

with Penoyar to inform him that his employment with ClearShark was being terminated. ClearShark had learned that Penoyar was manipulating company records, resulting in increasing his potential earning capacity to the detriment of other ClearShark employees. During the call, Penoyar did not disclose that he, Galeone, and Spigler had established J2R in March 2022 and had been planning to launch a competitive business.

Shortly after the call, Spigler accessed ClearShark's Capsule CRM platform, and downloaded contents relating to ClearShark's customer contacts, business opportunities, customer projects, and emails.Spigler did not ask for permission from ClearShark before downloading that confidential business information.

Later that night, Galeone also accessed the ClearShark Capsule platform and also downloaded contents from the platform relating to ClearShark's customer contacts, business opportunities, customer projects, and emails. Further, after downloading the contents, Galeone deactivated ClearShark's Capsule platform, which triggered a fourteen-day deadline to restore it before permanently deletion.



(Email to Galeone's ClearShark email account, dated 7/5/22). Galeone did not ask for permission from ClearShark before downloading that confidential business information, let alone deactivating the platform.

The next day, July 6, 2022, Galeone and Spigler notified ClearShark that they were resigning, effective immediately, from their employment with ClearShark. Neither Galeone nor Spigler informed ClearShark that they had downloaded ClearShark's confidential business information from the Capsule platform. Nor did Galeone disclose that he had deactivated the platform. Further, when Galeone and Spigler returned their work-issued computers, they were completely wiped of data.

It is clear that Galeone and Spigler were transferring ClearShark's confidential business information for J2R's use, and that they were trying to hide their tracks when doing so.

### *Internal Investigation Points to Extensive Theft*

ClearShark was unaware of what Galeone and Spigler had done. It was not until ClearShark reviewed the contents of Spigler's ClearShark email account that it discovered an email from Capsule to Spigler, dated July 5, 2022 at or around 10:27 a.m., regarding his request to download the content from ClearShark's Capsule CRM platform:



ClearShark clicked on these links and downloaded the content to preserve the data.

Subsequently, ClearShark searched Galeone's email account for similar emails and

found that, at or around 8:50 p.m. on that same night, Galeone had received a similar

email relating to the downloading of information from ClearShark's Capsule CRM

platform:

## Capsule

Hi Christopher,

You tried to do an export of your Capsule data however the exported file was too big to
send as an email message.

Not to worry though - what you can do instead is use these individual download links to
get your files:

Contacts:
https://clearshark.capsulecrm.com/api/v2/parties/filters/everyone/export.csv?
profile=backup

Cases:
https://clearshark.capsulecrm.com/api/v2/kases/filters/all/export.csv?
profile=backup

Opportunities:
https://clearshark.capsulecrm.com/api/v2/opportunities/filters/all/export.csv?
profile=backup

If you have any questions please contact us at support@capsulecrm.com.

**- The Capsule Team**

During this search, ClearShark also located the notification email confirming the

deactivation of ClearShark's Capsule CRM platform, which Galeone received just

minutes after (8:53 p.m.) this email relating to the downloading of information. That

is, ClearShark found evidence indicating that Galeone downloaded information just before deactivating the platform.

Realizing that the Capsule CRM platform had been deactivated, ClearShark quickly took the necessary steps to restore it and ensure control over and access to it. ClearShark continued to investigate and to confirm with representatives of Capsule whether Galeone and Spigler had downloaded the contents of the platform. These representatives shared screenshots of the user logs for ClearShark's Capsule CRM platform and confirmed that Galeone and Spigler had indeed downloaded the contents of the platform. Specifically, the Capsule representatives confirmed that Spigler was user 489074 (highlighted in green for ease of reference) and that the logs show he downloaded the content relating to customer and contact lists, pipeline opportunities, and project information, including pricing, bids, and emails, on July 5, 2022, between 10:27-28 a.m. They also confirmed that Galeone was user 489072 (highlighted in yellow for ease of reference) and that the logs show he downloaded the same content on July 5, 2022, at 8:51 p.m.

| timestamp | json.web.host | json.web.user | json.web.path |
|---|---|---|---|
| 2022-07-13 19:46:19.392 | clearshark.capsulecrm.com | 489074 | /api/v2/parties/filters/everyone/export.csv |
| 2022-07-13 18:41:30.386 | clearshark.capsulecrm.com | 489074 | /api/v2/opportunities/filters/all/export.csv |
| 2022-07-13 18:41:19.639 | clearshark.capsulecrm.com | 489074 | /api/v2/kases/filters/all/export.csv |
| 2022-07-13 18:41:19.612 | clearshark.capsulecrm.com | 489074 | /api/v2/parties/filters/everyone/export.csv |
| 2022-07-06 01:51:39.757 | clearshark.capsulecrm.com | 489072 | /api/v2/parties/filters/everyone/export.csv |
| 2022-07-06 01:51:35.945 | clearshark.capsulecrm.com | 489072 | /api/v2/opportunities/filters/all/export.csv |
| 2022-07-06 01:51:25.894 | clearshark.capsulecrm.com | 489072 | /api/v2/kases/filters/all/export.csv |
| 2022-07-05 15:28:38.887 | clearshark.capsulecrm.com | 489074 | /api/v2/parties/filters/everyone/export.csv |
| 2022-07-05 15:28:29.570 | clearshark.capsulecrm.com | 489074 | /api/v2/opportunities/filters/all/export.csv |
| 2022-07-05 15:27:49.352 | clearshark.capsulecrm.com | 489074 | /api/v2/kases/filters/all/export.csv |

As the trusted administrators of the Capsule CRM platform and sophisticated computer engineers, Galeone and Spigler knew exactly what they were doing — that is, they intentionally downloaded the content before losing access to the platform and then tried to hide their tracks so that ClearShark could not respond timely. There is simply no valid or innocent excuse for their misconduct.

### J2R Now Has ClearShark's Playbook and Is Competing Unfairly

Taken together, the misappropriated information essentially provides a competitor like J2R with the blueprints to replicate ClearShark's business, without investing any of the substantial time, money, effort, and manpower needed to create the information. In the hands of a direct competitor, this information could be

devastating to ClearShark. Further, there can be only one reason that Galeone and Spigler who downloaded ClearShark's confidential business information just before resigning: they were ensuring that J2R would have access to this information after their employment with ClearShark ended.

Upon information and belief, the misappropriated information has been accessed on or from J2R's computing system or platforms and have been used to recreate a similar platform, with the same information, for J2R's benefit. J2R, Galeone, and Spigler must be enjoined from retaining, using, and disclosing the misappropriated information, and must submit, at a minimum, to a <u>thorough computer forensic examination</u> to ensure that ClearShark's information is permanently removed from J2R's, Galeone's, and Spigler's computing devices, network,  platforms (such as Capsule), and any other back-up platforms/accounts (such as AWS, dropbox, GoogleDrive, OneDrive, etc.)

<u>LAW AND ARGUMENT</u>

## I.    The Standard for Injunctive Relief and Temporary Restraining Order

The same legal standard applies to a motion for a temporary restraining order and a motion for preliminary injunction. *See SEC v. Founding Ptnrs. Capital Mgmt.*, No. 09-cv-229, 2009 U.S. Dist. LEXIS 69422, at *7-8 (M.D. Fla. Jul. 24, 2009); *Mayoral v. Salin*, No. 21-62047, 2021 U.S. Dist. LEXIS 197739, at *5 (S.D. Fla. Oct. 14, 2021). To obtain a preliminary injunction, the moving party must establish

four elements: "[i] A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, [ii] that he is likely to suffer irreparable harm in the absence of preliminary relief, [iii] that the balance of equities tips in his favor, and [iv] that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *LSSI Data Corp. v. Comcast Phone, LLC*, 696 F.3d 1114, 1119 (11th Cir. 2012); Fed. R. Civ. P. 65.

## II.    The Requested Relief Is Warranted.

ClearShark requires a temporary restraining order and preliminary injunction preventing Defendants from using, disclosing, accessing, retaining, and failing to return the information misappropriated from ClearShark's Capsule CRM platform. This will prevent them from gaining an unjust and unlawful competitive advantage. ClearShark can satisfy the four required elements for the relief it requests. *First*, the evidence demonstrates that ClearShark is likely to succeed on the merits of its trade secret claims against the Defendants — ClearShark took reasonable steps to protect the confidentiality of its information, and the information has economic value because it is secret. Further, the evidence demonstrates that Galeone and Spigler (member-managers of J2R) misappropriated this information the day before unexpectedly resigning from ClearShark. *Second*, ClearShark will continue to suffer irreparable harm because misappropriated trade secrets are in the hands of its direct competitor, J2R, which can exploit them to unfairly compete. *Third*, the balance of

the equities weighs heavily in favor of ClearShark. *Fourth*, granting the requested relief best serves the public interest by promoting fair competition and business practices.

### A. ClearShark is likely to succeed on the merits of its trade secret claims.

"A substantial likelihood of success on the merits requires a showing of only likely or probable, rather than certain, success" as to one claim. *Schiavo ex rel. Schindler v. Schiavo*, 357 F. Supp. 2d 1378, 1383 (M.D. Fla. 2005) (emphasis omitted), *aff'd*, 403 F.3d 1223 (11th Cir. 2005). ClearShark can satisfy this burden for its claims under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, and the Florida Uniform Trade Secrets Act ("FUTSA"), Fla. Stat. § 688.001 *et seq.*, because the evidence shows that Defendants misappropriated ClearShark's trade secrets.[4]

The DTSA states that an "owner of a trade secret that is misappropriated may bring a civil action" in federal court "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b). The DTSA defines "misappropriation" as "(A) acquisition of a trade secret

---

[4] The DTSA and FUTSA have similar definitions. For efficiency sake, ClearShark explains why it will likely prevail on its claims under the DTSA, but for those same reasons, it will also likely prevail on its trade secret claims under the FUTSA. *See Freedom Med. Inc. v. Sewpersaud*, 469 F. Supp. 3d 1269, 1275 n.6 (M.D. Fla. 2020) ("DTSA and FUTSA can be analyzed together.").

of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who," among other things, "used improper means to acquire knowledge of the trade secret." 18 U.S.C. § 1839(5)(A)-(B). Under the DTSA, prohibited "misappropriation" includes the acquisition of a trade secret by improper means, as well as its use or disclosure. *See id.* at § 1839(5)(A)-(B). The DTSA defines "improper means" as including "theft bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* at § 1839(6)(A). The DTSA, moreover, defines a "trade secret" as:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if — (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily available through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. §1839(3).

Evidence demonstrates that Galeone's and Spigler's actions the day before resigning from ClearShark qualify as a "misappropriation" that was achieved through "improper means." Specifically, with knowledge that ClearShark's contents of the ClearShark Capsule platform was confidential and not to be taken, retained, disclosed to a third party, or used on anyone's behalf except ClearShark, Galeone and Spigler downloaded and have retained the contents of ClearShark's Capsule CRM platform for J2R's use. *See Freedom Med. Inc. v. Sewpersaud,* 469 F. Supp. 3d 1269, 1275 (M.D. Fla. 2020) (finding likelihood of success where defendant took customer lists and marketing strategies and defendant was bound by confidentiality obligations); (likelihood of success where employee obtained employers' confidential business information after deciding he was going to work for competitor); *PharMerica, Inc. v. Arledge*, No. 07-cv-486, 2007 U.S. Dist. LEXIS 19992, at *13 (M.D. Fla. Mar. 21, 2007) ("Arledge misappropriated those trade secrets by duplicating and copying them and/or sending them to his home computer or personal email account and deleting them from the PharMerica computers. Arledge further misappropriated PharMerica's trade secrets by breaching his duty return the documents. Hence, PharMerica has demonstrated that it would likely win a misappropriation of trade secrets claim against Arledge."); *see also HB&G Bldg. Prods. v. Digger Specialties Inc.*, 2022 U.S. Dist. Lexis 99362, at * (M.D. Ala. Jun. 3, 2022) (finding likelihood of success where defendant downloaded sensitive data

of his former employer); *Westrock v. Larry Health Sealy*, No. 2:20-cv-00180-RWS, 2021 U.S. Dist. LEXIS 121769, at *10-11 (N.D. Ga. Mar. 23, 2021) (holding that employer successfully showed that former employee downloaded thousands of documents before and after receiving an offer of employment from a competing company and connected their external hard drive to their company computer after beginning work for the competitor). Further, J2R (through Galeone and Spigler) now has this trade secret information and, at the very least, is in a threatening position to use it.

The misappropriated information, moreover, qualifies as trade secret under the DTSA. The ClearShark Capsule platform contains highly sensitive business information that is not generally known and gives ClearShark a competitive edge. *See Cytodyne Techs., Inc. v. Biogenic Techs., Inc.*, 216 F.R.D. 533, 536 (M.D. Fla. 2003) (finding that active customer lists and pricing constitute trade secret information); S*ethscot Collection, Inc. v. Drbul*, 669 So. 2d 1076, 1078 (Fla. 3d DCA 1996) (same). Further, ClearShark took reasonable efforts to maintain the secrecy of this information through its policies set forth in the Employee Handbook and incorporated into the plan agreements; by limiting personnel's access to certain confidential business information; and by password-protecting that information. *See* Unif. Trade Secrets Act § 1(4)(ii) cmts. (drafters of Uniform Trade Secret Act explain that "reasonable efforts to maintain secrecy" may include advising

employees of the existence of a trade secret or limiting access to a trade secret on a "need to know basis"); *see also Merrill v. Dunn*, 191 F. Supp. 2d 1346, 1349-51 (M.D.Fla. 2002) (reasonable efforts taken even where employee did not sign an employment agreement with non-soliciation and non-disclosure provision)

ClearShark's efforts to maintain the confidentiality of this information gives it "independent economic value." *See Ultimate Fitness Grp. LLC v. Anderson*, No. 18-60981, 2019 U.S. Dist. LEXIS 231055, at \*12 (S.D. Fla. Mar. 13, 2019) ("Similarly, here, the allegations that the mailing lists were stolen and used to solicit customers support the claim that the lists had independent economic value."); *PharMerica, Inc.* 2007 U.S. Dist. LEXIS 19992, at \*15-16 ("PharMerica took further efforts to protect confidentiality of its information by having Arledge and others like him sign the Agreement Not to Disclose or Solicit, which Arledge signed on December 16, 2004, and by restricting access to this information"). A direct competitor would benefit greatly if it had access to the information that J2R, Galeone, and Spigler misappropriated. With the information from ClearShark's Capsule CRM platform, J2R is immediately put in a position to strategically target customers and projects that were in ClearShark's pipeline—many of which are opportunities not generally known in the industry—at a lesser price than ClearShark. That is, Defendants can, with extreme ease, marginally undercut ClearkShark's pricing using stolen historical and current sales data, as well as stolen customer

contact information of key decision-makers. Further, J2R unfairly has this information without having to purchase it or devote the time and resources necessary to develop the information.

In sum, ClearShark can establish that it will likely prevail on the merits of its DTSA and FUTSA claims because Galeone, Spigler, and J2R misappropriated, by improper means, ClearShark's information that qualifies as trade secrets.

## B. ClearShark will suffer irreparable harm in the absence of a temporary restraining order.

ClearShark has suffered, and will continue to suffer, irreparable harm if the requested relief is not granted. Irreparable injury is harm that "cannot be undone through monetary remedies." *Northeastern Florida Chapter of Ass'n of General Contractors v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990); *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987). The U.S. Eleventh Circuit and the U.S. District Court for the Middle District of Florida both recognize that irreparable harm can be established where injuries are difficult to quantify. *MacGinnitie v. Hobbs Group, LLC*, 420 F.3d 1234, 1242 (11th Cir. 2005); *All Leisure Holidays*, 2012 U.S. Dist. LEXIS 168774, at *14-15 (S.D. Fla. Nov. 27, 2012) ("[W]hen the damages that might be suffered are speculative—as in the case of misappropriated trade secrets—the harm is properly characterized as irreparable because an inadequate remedy at law is presumed."). The DTSA recognizes that irreparable injury arises from the misappropriation of trade secrets, as it makes clear that even the *threat* of

misappropriation is irreparable harm that must be enjoined. 18 U.S.C. § 1836 (b)(3)(A)(i).

Here, ClearShark can show that Galeone and Spigler — while member-managers of J2R — improperly downloaded trade secrets from ClearShark's CRM platform so that J2R could use the information to unfairly compete, which is sufficient to show a threat of irreparable harm. *See Freedom Med., Inc.*, (recognizing that, "[i]n Florida, irreparable injury is presumed when there has been trade secret misappropriation," and that the evidence showed plaintiff "risks losing customers, goodwill, and market competitiveness to its direct competitor" and thus "faces irreparable harm"); *All Leisure Holidays Ltd.*, 2012 U.S. Dist. LEXIS 168774, at *15 ("Plaintiff's emails illustrate that Defendants likely have, or are about to, misappropriate All Leisure's trade secrets. Plaintiff has accordingly demonstrated that it will suffer an immediate, irreparable harm if the TRO is not granted."); *Arclin United States v. Vits Tech. Gmbh*, 2020 U.S. Dist. LEXIS 256083, at *8 (N.D. Ga. Mar. 31, 2020) ("the loss of trade secrets is an irreparable harm"); *G.W. Henssler & Assocs., Ltd. v. Marietta Wealth Mgmt.,* No. 17-2188, 2017 U.S. Dist. LEXIS 220400, at *15-16 (finding that the "[l]oss of confidential and proprietary information is per se irreparable harm").

ClearShark faces real threats and actual irreparable harm if the Court does not enter a temporary restraining order. Galeone and Spigler improperly took and

retained ClearShark's trade secrets the day before ending their relationship with ClearShark, and now J2R has those trade secrets in a position to use them. With ClearShark's trade secrets readily accessible, J2R can continue to unlawfully compete against and harm ClearShark, resulting in injuries that will prove difficult to measure with monetary precision. This is the *exact* scenario the DTSA contemplates emergency injunctive relief to address.

## C. ClearShark's injury outweighs any harm to J2R, Galeone, and Spigler.

Next, the Court must determine whether the threatened injury outweighs any damage that an injunction might cause. *Winter*, 555 U.S. at 24 (instructing that "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of requested relief"). ClearShark seeks narrowly tailored relief designed to protect its legitimate business interests and to ensure misappropriated information cannot be used further to unfairly compete. If the Court does not intervene, ClearShark stands to lose its value in intellectual property to J2R. In contrast, J2R, Galeone, and Spigler will suffer no undue hardship, as they merely need to comply with their obligations not to retain, use, or disclose ClearShark's confidential information and to comply with trade secret law. *See All Leisure Holidays Ltd.*, 2012 U.S. Dist. LEXIS 168774, at *15 ("The temporary inconvenience that would result to Defendants by precluding their use of this information during the short duration of the TRO is outweighed by the threatened

irreparable injury."); *Everest Nat'l Ins. Co. v. Rockhill Ins. Co.*, 2016 U.S. Dist. LEXIS 189685, at *16 (M.D. Fla. Oct. 5, 2016) ("[T]he Court finds that the balancing of harm favors Everest in this matter because the Court has been presented with evidence that Defendant Upton has absconded with confidential information and trade secrets and has taken employment with a direct competitor."); *see also Dish Network L.L.C. v. Ramirez*, No. 15-04712, 2016 WL 3092184, at *7 (N.D. Cal. Jun. 2, 2016) (balance of hardships tips in favor of plaintiff seeking injunction when it would "do no more than require Defendant to comply with federal and state laws"). The Court should therefore find that the equities favor issuing the requested relief. Further, the requested forensic examinations will merely allow the trade secrets and confidential business information that are unlawfully within Defendants' possession to be remediated permanently from their computing devices, network, and accounts.

### D. Injunctive relief will not disserve the public interest.

Finally, enjoining Defendants from using ClearShark's trade secrets and requiring forensic examinations will not disserve the public interest. Instead, the requested relief will promote fair competition, ethical behavior, honest work, and innovation. *Everest Nat'l Ins. Co.*, 2016 U.S. Dist. LEXIS 189685, at *16 (recognizing that temporary restraining order serves the public interest because protecting confidential information and trade secrets is a public policy of Florida). Without a robust ability to protect trade secrets and other proprietary and

confidential information, businesses will not be able to hire high-level employees and engage in fair and legitimate competition for fear of losing information to a competitor.

### III.   The Court Should Set A Preliminary Injunction Hearing And Grant Expedited Discovery Including A Forensic Examination.

An evidentiary hearing on ClearShark's request for preliminary injunction should be held. *See, All Care Nursing Serv., Inc. v. Bethesda Mem. Hosp., Inc*, 887 F.2d 1535, 1538 (11th Cir. 1989) (citation omitted) (stating that "where an injunction turns on the resolution of bitterly disputed fact . . . an evidentiary hearing is normally required to decide credibility issues."). During the evidentiary hearing, ClearShark will present evidence demonstrating why the Court should issue the requested preliminary injunction. Further, as explained in detail in ClearShark's motion to expedite discovery, which is being filed concurrently with this motion, expedited discovery is appropriate to give the Court a more complete record to conduct a preliminary evaluation of the merits of ClearShark's claims and to allow ClearShark to ascertain the extent of Defendants' unlawful misappropriation.

In order to maintain the *status quo* before Defendants' misappropriation of ClearShark's trade secrets, ClearShark should be allowed to commence expedited discovery immediately, conducting a forensic analysis of their computing devices, networks, and accounts to determine the extent of the misappropriation and begin to remediate that information. This Court has granted this same relief when issuing a

temporary restraining order in a similar trade secret case. *See, e.g.*, *Freedom Med., Inc.*, 469 F. Supp. 3d at 1279-80 ("Mr. Sewpersaud will make available to Freedom Medical, at a convenient location, all of the electronic devices he possesses that potentially have Freedom Medical Confidential Information. Freedom Medical will be given the opportunity to inspect those devices and, after disclosure to Mr. Sewpersaud, remove any Confidential Information it finds.").

## CONCLUSION

For the foregoing reasons, ClearShark respectfully requests the Court grant the motion, enter the requested temporary restraining order, and set an evidentiary hearing on ClearShark's request for a preliminary injunction.

*[Remainder Intentionally Blank]*

Respectfully submitted:

*/s/ Laurie M. Riley*
Laurie M. Riley, Esq.
Florida Bar No.: 657751
Jones Walker LLP
201 South Biscayne Boulevard, Suite 3000
Miami, FL 33131
Telephone:  305-679-5728
Facsimile:  305-679-5816
Email:  lriley@joneswalker.com

and

P.J. Kee, Esq.
La. Bar No.: 34860
*pro hac vice will be forthcoming*
JONES WALKER, LLP
201 St. Charles Avenue - 50th Floor
New Orleans, Louisiana  70170-5100
Telephone:  (504) 582-8000
Facsimile:  (504) 589-8230
Email:  pkee@joneswalker.com

**Counsel for ClearShark, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on Defendants by email on August 10, 2022.

*/s/ Laurie M. Riley*
Laurie M. Riley